COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

WINFRIED HEIRINGHOFF,                               )

                                                                              )               No.  08-02-00230-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )            
County Court at Law #1

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20010C14749)

                                                                              )

 

 

O
P I N I O N

 








Winfried Heiringhoff appeals his
convictions for three misdemeanor offenses of intentional or knowing
unauthorized discharge under Section 7.145 of the Texas Water Code.[1]  After the jury found Appellant guilty of each
charge, the trial court assessed punishment at one year jail time, probated two
years, and imposed a fine of $20,000, $18,500 probated with sentences to run
concurrently.  On appeal, Appellant
raises eight issues in which he argues the trial court erred in failing to
instruct the jury on lesser-included offenses, challenges the factual
sufficiency of the evidence to support the convictions, and complains that the
trial court=s
sentence was illegal, vague and/or unreasonable and alternatively, one of the
probation conditions was a delegation of the court=s
responsibility.  We affirm.

SUMMARY
OF THE EVIDENCE








Appellant is the
owner of 215-217 McArthur, a trailer park, in Canutillo, El Paso County.  Mobile home residents rent space on the
property.  There are ten to twelve mobile
homes on the property and a house which is also rented.  During the summer of 2001, Celso Rangel, a resident at the trailer park for over three
years, on three different occasions observed and videotaped Appellant pumping
sewage out of one of the park=s
cesspools.  In the first two incidents on
July 28, 2001 and August 5, 2001, Appellant pumped the sewage onto the
ground of an adjacent property.  In the
third incident on August 11, 2001, Appellant pumped the sewage from the
cesspool into another causing the second to overflow, spilling sewage onto the
ground.  The pipe from which Appellant
pumped the sewage is about eight to ten feet from Mr. Rangel=s trailer.  Mr. Rangel recalled that in the first
incident, the pumped sewage and waste water ran back underneath his trailer
home and stunk strongly of human waste. 
This smell lasted three to four days. 
In the August 5 incident, Mr. Rangel videotaped Appellant
pumping out sewage at 9 a.m. in the morning for over twenty-five minutes.  The sewage ran back underneath Mr. Rangel=s trailer, forming a pool of sewage for
the following three days.  The liquid
contained particles of human waste, was black in color, and smelled for three
to four days.  Mr. Rangel also observed
Appellant cleaning his pumping equipment by hosing it with water, which also
ran underneath the trailer.  Mr. Rangel
stated that the sewage dumped on the adjacent land on the other side of the
property fence remained there for about a day and a half.  According to Mr. Rangel, this was because the
land was all sand and filtered the sewage faster.  In the third incident on August 11, 2001, at
7:28 p.m. in the evening, the sewage overflow went underneath Mr. Rangel=s trailer and next to another trailer
on Appellant=s
property.

On November 1,
2000, Appellant had hired Ruben Gallegos of Henry=s
Cesspool Service and Construction, Inc. to pump and properly dispose of
material from the cesspool at issue.[2]  Mr. Gallegos charged Appellant at a rate
of eight cents per gallon plus a 6.75 percent service tax to pump the 6,000
gallon cesspool.  Mr. Gallegos serviced
the cesspool by using a three-inch vacuum pump attached to his truck container
and sucking out everything, including as much sludge on the bottom as
possible.  Appellant=s cesspool is approximately ten feet
deep.  There were three trailers hooked
up to the cesspool and it was receiving perhaps 4,500 gallons per day.  Mr. Gallegos recalled that at the time of
service, the cesspool was in pretty bad shape and running over.  Mr. Gallegos observed fecal matter flowing
out of the tank and believed the cesspool was extremely saturated.  In his opinion, the cesspool was
oversaturated and no longer leaching out because the bottom ground was already
sealed by carbon.  By the time he
serviced the cesspool, it was just an open bucket.  After servicing the cesspool for a second
time a couple of weeks later, Mr. Gallegos was not called to service it again.








Mr. Gallegos also
testified that if one were to pump a cesspool once a week, the suspended solids
floating at the top, such as fecal matter, toilet paper, and sanitary napkins,
would not have had time to coagulate and break down into sediment on the
bottom.  From the videotape, Mr. Gallegos
observed that Appellant used a two-inch centrifugal pump in pumping out the 6,000
gallon cesspool.  He observed that the
water being pumped out onto the ground was murky and sudsy.  Based on his training and experience, Mr.
Gallegos defined sewage as a combination of water, fecal matter, toilet paper,
sanitary napkins, greases, and food particles. 
Mr. Gallegos explained that construction of new cesspools is illegal,
but pre-existing cesspools have been grandfathered in and depending on
maintenance and the amount of entering water, a cesspool could last anywhere
from two to ten years.

Deputy Rodolfo Payan of the El Paso County Sheriff=s
Department Environmental Crimes Unit testified that he was familiar with
Appellant=s
property at 215-217 McArthur in Canutillo. 
In August 2001, he was contacted by Ms. Dominguez of the El Paso City
County Health Department and given the videotape taken by a resident of the
trailer park which showed a discharge from a ground cesspool.  After watching the videotape, Deputy Payan started an investigation and went out to the location
several times during August 2001.  On
those trips, Deputy Payan observed swampy water
underneath a trailer and noticed very green grass in certain areas around the
trailer park while further out the land was all dry.  Deputy Payan also
detected a strong ugly smell of feces around the trailer park.








Rose Marie
Dominguez, an environmental inspector with the El Paso City County Health
Department, testified that her department is in charge of inspecting on-site
sewage facilities and making sure septic systems meet the regulations set by
the Texas Natural Resource Conservation Commission (ATNRCC@). 
In August 2001, Ms. Dominguez responded to a complaint in reference to
Appellant=s
property.  On August 6, 2001, Ms.
Dominguez went out to the property to conduct an investigation.  She walked around the property and did not
note any violation with respect to septic waste.  Ms. Dominguez did not specifically look
underneath the trailers and did not detect any odor.  She did notice green vegetation in the area,
which is an indication that a septic system has too much liquid in it causing
the ground to be oversaturated.  Ms.
Dominguez recalled that the weather on August 6 was very hot and if anything
had been pumped out in the area, it would have evaporated because of the heat
or gone down to the ground.  Later in the
month, Ms. Dominguez returned to the site and gathered a water sample from a
well near the house and later a water sample from the cesspool.  The water samples were delivered to the
Health Department lab for analysis.

Teresa Owens, a
microbiologist with the El Paso City County Health Environmental District, was
the lab technician who tested one of the collected water samples.  Lab results of the cesspool sample tested
positive for e. coli or fecal contamination and coliform bacteria. 
Ms. Owens testified that the well water sample tested negative for coliforms, that is, the water was clean.

Dr. Jorge Magana,
the director of the District, testified that the cesspool water sample lab
results were consistent with testing of water from a cesspool or septic
tank.  Dr. Magana stated that the health
effect on individuals who ingest water contaminated with e.
coli or coliform groups depends upon the age of the
individual.  Young children and the
elderly are at greater risk for gastrointestinal infections.  Symptoms may include upset stomach, nausea,
vomiting, diarrhea, cramps, fever, or other serious illness, depending on the
toxicity of the germ.  In his opinion,
water containing e. coli or coliform
groups would be considered contaminated and would be classified as a pollutant.








Rick Talamantes, a criminal investigator for TNRCC testified
that he was informed that there was some type of a discharge at 215-217
McArthur in Canutillo and he went out to the location to investigate.  Using a handheld GPS, a global positioning
device, Mr. Talamantes walked the perimeter of the
property, marking the four corners of the property and a pipe on the other side
of the property fence as weigh points. 
Mr. Talamantes then walked a straight line to
the Rio Grande River and marked that position as a weigh point.  Through Terrain Navigator computer software,
Mr. Talamantes created a topographical map of the
area.  The computer estimate of the
straight line distance, or track length, from Appellant=s
property to the eastern bank of the Rio Grande River was 1,428 feet.

Terry McMillan is
a manager for the Waste and Waters Sections of the TNRCC in the El Paso
region.  Mr. McMillan oversees TNRCC
investigatory activities in this region. 
Part of this work involves studying the groundwater in El Paso County on
a regular basis and knowing the water table, the depth of groundwater in the
county.  If someone had a permit to
discharge sewage, Mr. McMillan as section manager would have knowledge of this
information.  To his knowledge, Appellant
did not have a permit to discharge and in Mr. McMillan=s
past nine years as section manager, Appellant has not had a permit to discharge
sewage.








Mr. McMillan
testified that he had been out to 215-217 McArthur in Canutillo and was
familiar with investigatory reports concerning underground water in the
proximate area of that location.  On
average, the agency measures the depth of groundwater in that area about five
times a year.  Based on this knowledge
and the agency=s
research, it was Mr. McMillan=s
opinion that the depth of groundwater near 215-217 McArthur ranged from eight
to twenty feet, depending on the amount of water in the Rio Grande River, the
season, irrigation activity, and rainfall. 
According to Mr. McMillan, the depth of underground water would be at
its highest in July and August and the agency normally observes an eight to ten
foot water table at that time of year. 
Their most recent measurement near Appellant=s
property was in January 2002, at which time the water table was at eighteen
feet at a location about two-tenths of a mile south of the property address.








Mr. McMillan was
also familiar with the permeability of the soil in that area.  Mr. McMillan explained to the jury that
permeability is the rate of flow through soil or surface rock.  Mr. McMillan=s
knowledge on this matter was formed by his observations of well driving and
installation, his investigators work in observing wells, published data, and
permeability studies of the area. 
According to Mr. McMillan, the soil at 215-217 McArthur is sandy loam, a
mixture of sand, clay, gravel, and silt, which is fine grain sand stone.  Depending on the amount of gravel, the soil=s permeability is between one to twenty
inches an hour.  On average, its
permeability is ten to twelve inches an hour, that is, if someone poured fluid
on the ground surface on Appellant=s
property, it would travel through the soil at a rate of approximately a foot an
hour.  A soil study of the entire region
showed the soil type around 215-217 McArthur to be AU1 sandy loam.  With respect to the land between 215-217
McArthur and the Rio Grande River, Mr. McMillan stated that there is a two foot
drop in elevation between Appellant=s
property and the river bank.  The
underground water in that area runs downhill, approximately due west toward the
Rio Grande River.  Appellant=s property is on the east side of the
Rio Grande River.  According to Mr.
McMillan, the rate of permeability is affected where ground has been previously
saturated.  If the soil is wet, new
fluids that are introduced into it will move faster than if the soil was
dry.  If the soil is dry, it will take a
while for the liquid to saturate the soil, but if it is already wet, the liquid
moves right through the soil like a pipeline.

As section
manager, Mr. McMillan was also familiar with groundwater contaminants and the
relationship between groundwater in that area and the Rio Grande River.  The ground between the surface and
groundwater will filter out contaminants like fecal coliform
and e. coli to some extent, but in order to do so
efficiently there needs to be several hundred feet of ground between the
surface and the groundwater.  Eight to
twenty feet would be minimal filtering and he would expect the contaminants to
make it to the groundwater at that depth. 
Mr. McMillan also stated that the groundwater in the area is in direct
contact with the Rio Grande River surface water and the irrigation ditch that
runs between the Rio Grande and the railroad tracks.

On
cross-examination, Mr. McMillan conceded that he had not gone onto Appellant=s property nor had he examined the sand
on that land.  However, he did visually
observe the soil in the area and noted it was sandy loam at the surface.  Mr. McMillan made this observation along the
right-of-way on McArthur Street about twenty feet from the trailer park.  Mr. McMillan admitted that TNRCC did not go
to the discharge location and take a sample to see what pollutant, if any, was
in the soil.  No one from his office went
to the discharge spot and drilled to determine the actual water table.  Further, Mr. McMillan did not gather sand and
run a fluid through it to test its permeability.  Rather, Mr. McMillan=s
testimony was based on information and factual sampling data gathered
throughout that area.








Defense counsel
questioned Mr. McMillan about his recent examination of the water table in
January 2002.  Mr. McMillan agreed that
Appellant=s
property is uphill from the location on Doniphan where the agency observed a
monitoring well.  Appellant=s property is most likely a foot
higher, which would mean the water table in comparison would measure nineteen
or twenty feet.  Mr. McMillan conceded
that the water table could be as low as twenty to twenty-five feet, but
historically it ranges from eight to twenty feet.  If it had not rained in a long time, the
water level could be lower than normal as various factors can cause
fluctuations in the water level.

Defense counsel
also questioned Mr. McMillan about the leaching system in septic tank
designs.  Mr. McMillan agreed that
leaching effluent in septic tanks includes e. coli if
it is present in the fluid and that TNRCC authorizes installation of septic
tanks with leach fields that are only two feet above the groundwater.  Mr. McMillan stated this is a sufficient
barrier for soil absorption of the e. coli-containing fluid prior to reaching
the groundwater.  Leach lines, however,
are designed to emit very small amounts on the side and top of the line, so
that the emission can be absorbed and digested in the top few inches of the
soil.  The system is designed to minimize
downward migration.  Natural bacteria in
the soil will digest the emission in small amounts.  Leach lines are designed for very small
leaching amounts and cannot handle large amounts of effluent.  If the soil is too permeable, liners are
required.  Leach lines are installed in
shallow soil because exposure to sun aids in the digestion by natural bacteria
in the soil.  Mr. McMillan conceded that
he could not testify as to how far the e. coli in the
alleged discharges traveled through the sand nor whether the e. coli was in
some fashion removed from the soil before reaching the groundwater.  However, he maintained his opinion that it
would take several hundred feet to completely clean out a contaminant before
reaching the groundwater.








The State called
Roberto Gonzalez, a program manager for the on-site sewage facility program of
the El Paso City County Health Department, to testify about the program
enforcement and its policies and procedures on septic systems.  Mr. Gonzalez stated that his department
issues permits only for septic tanks, not cesspools, but cesspools existing
prior to August 24, 1988 are grandfathered from the new standards.  His department deals with cesspools if they
are creating a nuisance, backing up, or overflowing.  They do not require pumping unless the
cesspool is backing up.  If problems
persist, the cesspool will no longer be grandfathered and the department will
require construction of a system that meets current standards.

Mr. Gonzalez also
described the common two-compartment septic tank system to the jury.  In this system, heavier solids sink to the
bottom to form sludge, while the remaining liquid, effluent, goes to the second
compartment, which is connected to the leach field lines of perforated
pipe.  From the leach lines, the effluent
filters into the ground.  His department
requires at least six inches of gravel or other approved media on the bottom of
the leach field to act as a chamber.  Mr.
Gonzalez stated that his department does not approve a septic system that uses
more than 5,000 gallons of domestic waste per day.  Tank size and leach lines are determined by
the anticipated water flow per day.

After the State
rested, the defense called two witnesses to testify on Appellant=s behalf.  Jerry Estep, a real estate broker and
longtime friend of Appellant, testified that on February 19, 2002, he
videotaped the drilling of a hole in the ground at 215-217 McArthur for the
purposes of  locating
the water table on Appellant=s
property.  Mr. Estep observed workers
drilling a large hole near the back of the property.  Using a tape measure attached to a rock, they
measured the hole depth at approximately twenty-two
feet.  Mr. Estep did not see dripping
water, but rather the sand was dry.  They
could not drill any deeper because of equipment limitations.








Frank Gadet, a self-employed environmental engineer, testified
about the soil permeability conditions on Appellant=s
property.  Mr. Gadet
has a background in water resources planning and worked for the city of Fort
Worth in its waste water division as a manager for its industrial waste
division.  Mr. Gadet
is now in private practice and works with industrial clients in waste water
treatment and remediation of contaminated soils.  At Appellant=s
request, Mr. Gadet went to 215-217 McArthur that
morning before trial to test the permeability of the soil.  Mr. Gadet collected
some of the soil in a bucket and placed a six-inch sample into a plastic
cylinder.  He then poured two inches of
water onto the soil and observed the sample for the next half hour.  The soil was sandy, but it did absorb the
water.  The water did not extend more than
five to six inches down and the remaining tube was dry.  Mr. Gadet described
the soil type as sandy loamy, but noted that it was very dry.  According to Mr. Gadet,
there are several mechanisms by which soil interacting with a pollutant will
act like a filter to absorb and clean waste water.  Mr. Gadet was
familiar with studies which suggest how far it takes water percolating through
soil to travel before coliforms in the water are
almost completely treated.  A study found
that coliforms and viruses can be completely removed
after passing through just a few feet of soil. 
Mr. Gadet was also familiar with the TNRCC
regulation that requires a leach field to be only two feet above
groundwater.  In Mr. Gadet=s opinion, the waste water placed on
the ground in Appellant=s
case dried out and started to percolate and be absorbed.  His experiment showed that two inches of
water would be percolated in six inches of ground.  The waste water did not come anywhere near
the ground water, which was deeper than twenty-two feet.  In his opinion, the fluid was absorbed by the
soil and did not go more than three feet in the ground,
therefore any coliform or other pollutant from the
discharge remained in the soil and did not reach the groundwater.

 

 








DISCUSSION

Lesser-Included
Offenses

In Issues One
through Five, Appellant contends the trial court erred in failing to instruct
the jury on alleged lesser-included offenses contained in Section 341 of the
Texas Health and Safety Code, namely Sections 341.013(b), 341.013(c),
341.014(a), 341.014(b)(2), and 341.014(e). 
In his brief, Appellant argues that the lesser-included offenses for Aimproper disposal of waste or human
excreta@ were
requested based on the premise that evidence showed Appellant had committed
health and nuisance violations, rather than water pollution violations.

We apply a
traditional two-prong test to determine whether Appellant was entitled to a
charge on a lesser-included offense.  See
Moore v. State, 969 S.W.2d 4, 8 (Tex.Crim.App.
1998); Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex.Crim.App.
1993)(en banc), cert. denied, 510 U.S. 919, 114
S.Ct. 313, 126 L.Ed.2d 260 (1993); Aguilar v.
State, 682 S.W.2d 556, 558 (Tex.Crim.App. 1985); Royster v. State, 622 S.W.2d 442, 446 (Tex.Crim.App. 1981)(plurality opinion).  First, we determine whether the offense is a Alesser included offense@ as defined in Article 37.09 of the
Code of Criminal Procedure, which in most cases requires deciding whether the Alesser included offense must be
included within the proof necessary to establish the offense charged . . . .@ 
Bignall v. State, 887 S.W.2d 21,
23 (Tex.Crim.App. 1994); see Tex.Code Crim.Proc.Ann.
art. 37.09 (Vernon 1981); Moore,
969 S.W.2d at 8; Ramirez v. State, 976 S.W.2d 219, 226-27 (Tex.App.--El Paso 1998, pet. ref=d).  Second, the record must show some evidence
that would permit a rational jury to find that if the defendant is guilty of an
offense, he was guilty only of the lesser offense.  Feldman v. State, 71
S.W.3d 738, 750-51 (Tex.Crim.App. 2002); Moore,
969 S.W.2d at 8; Rousseau, 855 S.W.2d at 672. 








In this case,
Appellant was charged by information with three separate offenses of
intentional or knowing unauthorized discharge under Section 7.145 of the Texas
Water Code[3],
each charge differing only in the date the charged offense was alleged to have
been committed.  In
each amended information it alleged Appellant:

[D]id then and there unlawfully,
intentionally, and knowingly discharge, deposit, emit, drain, allow to seep,
releases or dispose of and permit the discharge, deposit, emission, drainage,
seepage, release and disposal of  a waste
or pollutant, namely SEWAGE into and adjacent to water in the State, namely,
underground water located near 215 McArthur, Canutillo, El Paso County, State
of Texas, which caused and threatened to cause water pollution, and said
discharge was not discharged in strict compliance with all required permits or
with an order issued or a rule adopted by the appropriate regulatory agency in
violation of Texas state law section 7.145 V.T.C.A. Water Code.

 








At trial, Appellant=s counsel requested the following as
lesser-included offenses for Aimproper
disposal of waste or human excreta@:  (1) a person commits an offense if he allows
sewage to accumulate in a public place or discharges sewage into a public
place; (2) a person commits an offense if he deposits or disposes of polluting
material or waste in a manner that may cause pollution of surrounding land or
may cause the contamination of groundwater; (3) a person commits an offense if
he disposes of human excreta in a method not approved by the health department;
(4) a person commits an offense if he disposes of effluent from a septic tank
in a method that creates a public health nuisance; and (5) a person commits an
offense if he removes human excreta from any place and handle[s] it in a manner
that creates a public nuisance.  The
trial court refused to instruct the jury on the asserted lesser-included
offenses.

Under Article
37.09 of the Code of Criminal Procedure, an offense is a lesser-included
offense if::

(1)        it is
established by proof of the same or less than all the facts required to
establish the commission of the offense charged;

 

(2)        it differs from
the offense charged only in the respect that a less serious injury or risk of
injury to the same person, property, or public interest suffices to establish
its commission;

 

(3)        it differs from
the offense charged only in the respect that a less culpable mental state
suffices to establish its commission; or 

 

(4)        it consists of
an attempt to commit the offense charged or an otherwise included offense.

 

Tex.Code Crim.Proc.Ann.
art. 37.09 (Vernon 1981).

As set forth in Jacob
v. State, 892 S.W.2d 905 (Tex.Crim.App. 1995), we
employ a 








three-step
analysis in examining whether the asserted lesser-included offense is
established by the same or less proof than the facts required to establish the
commission of the offense charged.  Id. at 907-08; Rodriguez v. State, 90 S.W.3d 340, 369
(Tex.App.--El Paso 2001, pet. ref=d).  First, we examine the elements of the charged
offense as they appear in the indictment, with special attention to the facts
required to prove the charged offense.  Jacob,
892 S.W.2d at 907. 
AFacts
required@ means
the evidence legally required to prove the elements of the charged
offense.  Jacob, 892 S.W.2d at 908. 
Second, we examine the statutory elements of the offense sought as a
lesser-included offense.  Id. at 907. 
Lastly, we must examine the proof presented at trial to show the
elements of the charged offense.  Id. at 907-08. 
AIf the
facts required to prove the elements of the
lesser-included offense are not functionally the same or less than the charged
offense, it is not a lesser-included offense even if the facts presented at
trial could prove the lesser-included offense.@  Noyola v. State, 25 S.W.3d 18, 21 (Tex.App.--El
Paso 1999, no pet.)(analyzing the Court=s interpretation of Article 37.09(1) in
Jacob v. State).

Section
341.014:  Disposal of Human Excreta

In Issues Two,
Three, and Four, Appellant argues that paragraphs (a), (b)(2), and (e) of
Section 341.014 of the Texas Health and Safety Code are lesser-included
offenses of unlawful discharge under Section 7.145 of the Texas Water
Code.  In pertinent part, Section 341.014
provides:

(a)        Human excreta in a populous area shall
be disposed of through properly managed sewers, treatment tanks, chemical
toilets, or privies constructed and maintained in conformity with the department=s specifications, or by other methods
approved by the department.  The disposal
system shall be sufficient to prevent the pollution of surface soil, the
contamination of a drinking water supply, the infection of flies or
cockroaches, or the creation of any other public health nuisance.

 

(b)        Effluent from septic tanks constructed
after September 4, 1945, shall be disposed of through: 

 

(1)        a subsurface
drainage field designed in accordance with good public health engineering
practices; or 

(2)        any other
method that does not create a public health nuisance.

 

                                                              .               .               .

 

(e)        Material and human excreta removed from
a privy vault or from any other place shall be handled in a manner that does
not create a public health nuisance.  The
material and human excreta may not be deposited within 300 feet of a highway
unless buried or treated in accordance with the instructions of the local
health authority or the board.[4]








Tex.Health & Safety Code Ann. ' 341.014(a), (b), (e)(Vernon
2001).

The State was
required to prove that on the specified dates, Appellant intentionally or
knowingly discharged or permitted the discharge of a waste or pollutant, namely,
sewage, into or adjacent to water in Texas, namely, underground water near 215
McArthur that caused or threatened to cause water pollution and that this
discharge was done without a permit, order, or rule adopted by the appropriate
regulatory agency.  See Tex.Water Code Ann. '
7.145.








Comparing the
charged offense with paragraphs (a), (b)(2), and (e) of Section 341.014, we
find that the asserted lesser-included offenses are not established by proof of
the same or less than all the facts required to establish the commission of the
offense charged.  See Tex.Code Crim.Proc.Ann.
art. 37.09(1).  Section 341.014(a) requires disposal of human
excreta in a system constructed and maintained in conformity with the
department=s
specifications, or by other methods approved by the health department.  See Tex.Health & Safety Code Ann. ' 341.014(a).  The facts required to establish commission of
unauthorized discharge causing or threatening to cause water pollution do not
require such additional proof. 
Paragraphs (b)(2) and (e) of Section 341.014
would require the State to prove the creation of a public health nuisance.  See Tex.Health & Safety Code Ann. ' 341.014(b)(2),
(e).  Appellant points out that under
Section 341.011 of the Health and Safety Code, the following is defined as a
public health nuisance:  Asewage, human excreta, wastewater,
garbage, or other organic wastes deposited, stored, discharged, or exposed in
such a way as to be a potential instrument or medium in disease transmission to
a person or between persons.@  Tex.Health
& Safety Code Ann. '
341.011(5) (Vernon 2001).  Appellant also
notes that Section 26.001of the Water Code defines pollution as: Athe alteration of the physical, thermal,
chemical, or biological quality of, or the contamination of, any water in the
state that renders the water harmful, detrimental, or injurious to humans,
animal life, vegetation, or property or to public health, safety, or welfare,
or impairs the usefulness or the public enjoyment of the water for any lawful
or reasonable purpose.@  See Tex.Water Code Ann. '
26.001(14)(Vernon Supp. 2003)(effective upon
delegation of NPDES permit authority). 
Appellant argues that a public health nuisance as defined above
constitutes partial proof of unauthorized discharge, differing only in the
additional proof that the discharge was Ainto
or adjacent to water.@  We disagree. 
The charged offense does not require the State to prove that the actual
or threatened water pollution created a nuisance, that is, that the
discharge of the sewage was a Apotential
instrument or medium in disease transmission to a person or between persons.@ 
See Tex.Health & Safety Code Ann. ' 341.011(5).  While an alteration of water in the state may
render that water Aharmful,
detrimental, or injurious@
to humans and therefore polluted, the proof of this status does not require
specific additional proof that the discharge of sewage or human excreta, which
altered the water, was done in such a manner as to make the discharged material
a potential instrument or medium for disease transmission--evidence which would
establish a public health nuisance violation.








Alternatively,
Appellant argues that disposing of sewage in a manner that causes a public
health nuisance differs from unauthorized discharge only in the respect that a
less serious injury or risk of injury to the same person, property, or public
interest suffices to establish its commission. 
See Tex.Code Crim.Proc.Ann.
art. 37.09(2).  Specifically, Appellant contends that
potential transmission or disease is a less serious injury or risk of injury
than transmission of disease through contamination of water.  Article 37.09(2) applies to greater and
lesser offenses that differ only by the injury or risk of injury.  See Tex.Code Crim.Proc. Ann. art. 37.09(2).  As discussed above, the State was not
required to prove transmission of disease through contamination of water.  Article 37.09(2) does not provide a basis for
establishing any of the asserted lesser offenses as lesser-included offenses
for the offense of unauthorized discharge of a waste or pollutant.  Issues Two, Three, and Four are overruled.

Section
341.013:  Garbage, Refuse, and Other
Waste

In Issues One and
Five, Appellant argues that paragraphs (b) and (c) of Section 341.013 of the
Texas Health and Safety Code are lesser-included offenses of unlawful discharge
under Section 7.145 of the Texas Water Code. 
In pertinent part, Section 341.013 provides:

(b)        Kitchen waste, laundry waste, or sewage
may not be allowed to accumulate in, discharge into, or flow into a public
place, gutter, street, or highway.

 

(c)        Waste products, offal, polluting
material, spent chemicals, liquors, brines, garbage, rubbish, refuse, used
tires, or other waste of any kind may not be stored, deposited, or disposed of
in a manner that may cause the pollution of the surrounding land, the
contamination of groundwater or surface water, or the breeding of insects or
rodents.

 

Tex.Health & Safety Code Ann.
' 341.013(b), (c).  Again, by information, the State was required
to prove that Appellant intentionally or knowingly discharged or permitted the
discharge of a waste or pollutant, namely, sewage, into or adjacent to water in
Texas, namely, underground water near 215 McArthur that caused or threatened to
cause water pollution and that this discharge was done without a permit, order,
or rule adopted by the appropriate regulatory agency.  See Tex.Water Code Ann. '
7.145.








Comparing the
charged offense with paragraph (b) of Section 341.013, we find that the
asserted lesser-included offense is not established by proof of the same or
less than all the facts required to establish the
commission of the offense charged.  See
Tex.Code Crim.Proc.Ann.
art. 37.09(1).  Section 341.013(a) would require the State to
prove Appellant discharged sewage Ainto
a public place, gutter, street, or highway.@  See Tex.Health & Safety Code Ann. ' 341.01(b).  The facts required to establish commission of
unauthorized discharge causing or threatening to cause water pollution do not
require such additional proof. 

Under Section
341.013(c), waste of any kind may not be deposited or disposed of in a manner
that may cause the contamination of groundwater.  See Tex.Health & Safety Code Ann. ' 341.013(c).  Comparing paragraph (c) of Section 341.013
with the charged offense, it appears that the same or less proof would
establish the facts required to establish commission of the alleged
unauthorized discharge offense.  In its
response, the State argues that Section 341.013(c) is not a lesser-included
offense because it would require the State to meet a higher burden of proof as
the provision specifically identifies the type of water--groundwater or surface
water--that is the object of contamination. 
Section 7.145 of the Water Code, in contrast, only requires that the
State show the discharge was Ainto
or adjacent to water@,
which the Code broadly defines as:

[G]roundwater,
percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs,
rivers, streams, creeks, estuaries, marshes, inlets, canals, the Gulf of Mexico
inside the territorial limits of the state, and all other bodies of surface
water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all
watercourses and bodies of surface water, that are wholly or partially inside
or bordering the state or inside the jurisdiction of the state.

 

See Tex.Water Code Ann. '
26.001(5).








In Appellant=s case, however, the State specifically
alleged that Aunderground
water near 215 McArthur@
was the object of actual or threatened water pollution.  At trial, the State presented evidence to
show the elements of the charged offense--evidence which could have also proven
a violation of Section 341.013(c).[5]








However, even if
we were to conclude that Section 341.013(c) were a lesser-included offense of the
charged offense, there is no evidence that would permit a rational jury to find
that if Appellant were guilty of an offense, he was guilty only of the alleged
lesser offense.  See Rousseau,
855 S.W.2d at 672. 
Under the second prong for determining whether Appellant was entitled to
a charge on a lesser-included offense, the evidence must be evaluated in the
context of the entire record.  Moore,
969 S.W.2d at 8. 
There must be some evidence from which a rational jury could acquit the
defendant on the greater offense while convicting him of the lesser-included
offense.  Id.  In this case, if the jury were to find that
Appellant deposited or disposed of waste in a manner that may cause the
contamination of groundwater, such a finding would necessarily be based upon
evidence that the undisputed manner of disposal, pumping sewage onto the
ground, was the conduct that may have caused contamination of groundwater.  Further, in this case a finding of the
threatened groundwater contamination could only be supported by the same
evidence at trial showing the discharge was Ainto
or adjacent to@ the
underground water near 215 McArthur. 
Therefore, the second prong cannot be satisfied.  We overrule Issues One and Five.

Factual
Sufficiency of the Evidence

In Issues Six and
Seven, Appellant complains the evidence is factually insufficient because the
State failed to prove that the sewage he discharged Acaused
or threatened to cause@
water pollution or that the discharge was Ainto
or adjacent to@
underground water.[6]  Specifically, Appellant asserts that his
expert offered contrary evidence that the sewage did not pollute or threaten to
pollute water.  

Standard
of Review








Appellant does not
challenge the legal sufficiency of the evidence to support his convictions for
unlawful discharge, therefore we begin with the
presumption that the evidence was legally sufficient.  See Clewis v.
State, 922 S.W.2d 126, 129 (Tex.Crim.App.
1996).  In reviewing the factual
sufficiency of the evidence, we examine all the evidence in a neutral light,
favoring neither party.  Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App.
2000); Clewis, 922 S.W.2d at 129.  A reviewing court in conducting a factual
sufficiency review asks whether a neutral review of all of the evidence, both
for and against the finding, demonstrates that the proof of guilt is so
obviously weak as to undermine confidence in the jury=s
determination or the proof of guilt, although adequate if taken alone, is
greatly outweighed by contrary proof. 
Johnson, 23 S.W.3d at 11.  We review the evidence weighed by the trier of fact that tends to prove the existence of the
elemental fact in dispute and compare it with the evidence that tends to
disprove that fact.  Jones v. State,
944 S.W.2d 642, 647 (Tex.Crim.App. 1996), cert.
denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d
54 (1997).  Although we are authorized to
set aside the fact finder=s
determination under either of the two circumstances, our review must employ
appropriate deference to prevent the substitution of our judgment for that of
the fact finder.  See Johnson,
23 S.W.3d at 12; Jones, 944 S.W.2d at 648.  Further, we will not substantially intrude
upon the fact finder=s
role as the sole judge of the weight and credibility given to any evidence
presented at trial.  See Johnson, 23 S.W.3d at 7; Jones, 944 S.W.2d at 648.  








In the present
case, Terry McMillan, the State=s
expert witness, provided key testimony to support the State=s allegation that Appellant discharged
sewage into or adjacent to underground water near 215 McArthur that caused or
threatened to cause water pollution.  As
manager for the Waste and Waters Section of the TNRCC, Mr. McMillan=s work involved studying groundwater in
El Paso County on a regular basis and knowing the depth of groundwater in the
county.  Mr. McMillan was familiar
with reports concerning underground water in the proximate area of 215-217 McArthur
in Canutillo, El Paso County.  Based on
his agency=s
research, it was Mr. McMillan=s
opinion that the depth of the groundwater near 215-217 McArthur ranged from
eight to twenty feet, depending on certain factors such as the amount of water
in the Rio Grande, irrigation activities, seasonal changes, and rainfall.  Mr. McMillan testified that the depth of
underground water is at its highest during the months of July and August, at
which time the agency normally observes an eight to ten foot water table.  A recent measurement of the water table at a
location two-tenths of a mile south of 215-217 McArthur and about a one foot
lower in elevation recorded the water table at eighteen feet.  Mr. McMillan estimated that based on this
data the water table under Appellant=s
property at that given time, January 2002, would be nineteen or twenty
feet.  Mr. McMillan conceded that the
water table could be as low as 

twenty-five
feet, but stated that historical data placed the average range between eight to
twenty feet.

Mr. McMillan also
provided testimony concerning the characteristics and rate of permeability of
the soil type found in the Canutillo area and visually observed on Appellant=s property.  Based on knowledge from personal
observations, reports, published data, and permeability studies of the area,
Mr. McMillan opined that sandy loam, the type of soil at 215-217 McArthur, had
an average permeability of ten to twelve inches an hour, depending on the
amount of gravel it contained.  Mr.
McMillan stated that if the soil was wet, new fluids would move faster through
that soil than if it were dry, with the new fluids moving through the soil like
a pipeline.  While the ground between the
surface and the groundwater will filter out contaminants like fecal coliform and e. coli to some
extent, to do so efficiently requires a distance of several hundred feet.  At eight to twenty feet, the range of the
water table in the area, Mr. McMillan would expect contaminants to make it
to the groundwater with minimal filtering. 
A sample from the water well on the property, however, tested negative
for e. coli or coliform
bacteria.








With respect to
the proximity of the Rio Grande River, State witness Rick Talamantes,
a criminal investigator with TRNCC, testified that the distance from Appellant=s property to the eastern bank of the
Rio Grande River was 1,428 feet.  Mr.
McMillan testified that there is a two foot drop in elevation between Appellant=s property and the river bank.  Mr. McMillan also stated that the groundwater
in that area is in direct contact with the Rio Grande River and the irrigation
ditch running alongside the river.

At trial,
Appellant called Jerry Estep, a real estate broker and friend, to testify about
the drilling of a hole on Appellant=s
property.  Mr. Estep observed workers
drilling a hole in search of the water table underneath the property.  They measured the hole
depth at twenty-two feet without seeing water or wet sand.

Appellant=s expert witness, Frank Gadet, tested the permeability of the soil on Appellant=s property by collecting a soil sample,
placing six inches of the collected soil into a plastic cylinder, pouring two
inches of water onto the soil, and observing the sample for half an hour.  Mr. Gadet noted
that the soil, a sandy loam type, absorbed the water.  The water did not extend more than five to
six inches down and the remaining tube was dry. 
Based on his experiment, Mr. Gadet opined that
two inches of water would be percolated in six inches of ground.  In Mr. Gadet=s opinion, the waste water Appellant
placed on the ground dried out and was absorbed in the soil, traveling no more
than three feet into the ground. 
According to Mr. Gadet, the waste did not
come anywhere near the groundwater, therefore, any coliform
or other pollutant it contained remained in the soil without reaching the
groundwater.








From the State=s evidence, the jury could reasonably
infer that the geological characteristics of the region were similar to those
found on Appellant=s
property and its surroundings.  The State=s evidence also supported an inference
that the historical data on groundwater in the region, that is, during the
months of July and August the water table measures at eight to ten feet and at
other times of the year measures up to twenty feet, was also applicable to
groundwater that likely exists under Appellant=s
property as well.  Mr. Talamantes=
GPS measurements placed the proximity of the Rio Grande River within 1,500 feet
of the 215-217 McArthur property and in Mr. McMillan=s
expert opinion groundwater near 215 McArthur was in direct contact with the
surface water of the river.  Appellant
offered contrary evidence that the water table was more than twenty-two feet
below the property and his expert, Mr. Gadet, stated
that the waste water was absorbed within three feet of the soil without ever
reaching groundwater.  The jury is the
sole judge of witness credibility and is free to believe or disbelieve any
witness.  Jones v.
State, 984 S.W.2d 254, 258 (Tex.Crim.App. 1998).  By its verdict, the jury apparently found Mr.
McMillan more credible with regard to soil type permeability, groundwater
measurements in the Canutillo region, and the ability of soil to filter out
contaminants.

Viewing all the
evidence in a neutral light, we cannot conclude that the State=s proof was too weak, by itself, to
support the jury=s
findings that the discharge was adjacent to water and threatened to cause water
pollution nor is the jury=s
finding of guilt so contrary to the overwhelming weight of the evidence as to
be clearly wrong and manifestly unjust. 
Finding the evidence was factually sufficient to support the conviction,
we overrule Issues Six and Seven.

Illegal
Sentence/Probation Condition

In Issue Eight,
Appellant contends the trial court erred in assessing an illegal, vague and/or
unreasonable sentence and in relinquishing the trial court=s responsibility by allowing others to
set the conditions of probation.  First,
Appellant complains that the following handwritten language, which appeared on
the judgment and sentence, was part of the sentence because it does not appear
on Exhibit A, the form listing probation conditions:








[W]ithin 30
days of today=s date,
[defendant] to employ engineer to design & submit a plan for septic system
that will protect water on both 215 & 217 McArthur, said plan to be
approved by OSSF Program [On-Site Sewage Facility] w/in 30 days of approval by
OSSF, construction is to be completed.

 

However, at the conclusion of the
punishment phase of the trial, the trial judge expressly stated that the above
requirement was a condition of Appellant=s
probation.  Community supervision, or
probation, is an arrangement in lieu of the sentence, not as part of the
sentence.  Speth
v. State, 6 S.W.3d 530, 532 (Tex.Crim.App. 1999)(en banc).  The
sentence and the conditions of community supervision are separate parts of the
judgment.  Id.  We conclude the above requirement was a
condition of Appellant=s
probation, not an illegal sentence.  

Second, in the
alternative Appellant argues that the probation condition was vague and
unreasonable and constituted the trial court=s
relinquishment by allowing others to set the conditions of probation.  The trial court has broad discretion in
determining the conditions of probation to be imposed.  Speth, 6 S.W.3d at 533.  The
judge may impose any reasonable condition that is designed to protect or
restore the community, protect or restore the victim, or punish, rehabilitate,
or reform the defendant.  Id.; Tex.Code Crim.Proc. Ann. art. 42.12, ' 11(a)(Vernon Supp. 2003). 
Conditions not objected to are affirmatively
accepted as terms of the award of community supervision, which the courts of
Texas consider a contractual privilege.  Speth, 6 S.W.3d at 534.  AA
defendant who benefits from the contractual privilege of probation, the
granting of which does not involve a systemic right or prohibition, must
complain at trial to conditions he finds objectionable.@  Id.








In this case,
Appellant on direct examination at the punishment phase of the trial confirmed
that he was willing to do what was being requested, that is, have an engineer
go to his property and develop a plan for putting in a septic system which will
help protect the water on the property. 
Rather than raising a formal objection to the challenged probation
condition, Appellant=s
counsel asked the trial judge that the time allotted for approval and
construction be increased from thirty to sixty days.  Appellant made no formal objection to the
imposition of this condition on his probation. 
Therefore, he cannot raise his complaint for the first time on appeal.  See Speth,
6 S.W.3d at 534 n.10 (complaints that a trial court abused its discretion by
imposing conditions that are unreasonable or violate constitutional rights or
statutory provisions must be timely objected to in order to be raised on
appeal).  Issue Eight is overruled.

We affirm the
trial court=s
judgment.

 

 

 

August
22, 2003

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
Appellant was charged by information with three separate offenses.  The independent causes of action were tried
together, but remained separate cases. 
On appeal, Appellant challenges the trial court=s
judgment in each case and raises the same issues for our review, but each case
has a separate appellate opinion.  The
companion cases for this opinion are Nos. 

08-02-00228-CR
and 08-02-00229-CR.





[2]
At trial, Mr. Gallegos explained to the jury that a cesspool is an open pit in
the ground that is usually lined with cinder blocks with a cement top.  Liquid seeps from the bottom and all around
the sides until it fills up or becomes oversaturated.  A septic tank differs in that it is a sealed
concrete or metal tank which does not permit seepage.  Rather, it holds entering fecal matter and
solids, which form a sludge as a result of bacteria
action breaking down the matter and ultimately turns into carbon.  Outgoing water or effluent is directed to and
percolates in a leaching area.  The
County Health Department provides the specifications for a leaching field and
requires they be at least four to six feet above the water table based on the
theory that the water emitted will be cleaned by the soil before reaching the
ground water.





[3]
Section 7.145 of the Water Code provides: 
AA person
commits an offense if the person, acting intentionally or knowingly with
respect to the person=s
conduct, discharges or allows the discharge of a waste or pollutant:  (1) into or adjacent to water in the state
that causes or threatens to cause water pollution unless the waste or pollutant
is discharged in strict compliance with all required permits or with an order
issued or a rule adopted by the appropriate regulatory agency.@ 
Tex.Water Code Ann. '
7.145(a)(1)(Vernon Supp. 2003).  An offense under this section is punishable
by confinement for a period not to exceed five years and/or fine not less than
$1,000 or more than $100,000.  See
Tex.Water Code Ann. ''
7.145(b), 7.187(1)(C), (2)(F) (Vernon 2000 & Supp.
2003).





[4]
Apparently, in Appellant=s
proposed jury charge, numbers three through five were in reference to Section
341.014 (a), (b)(2), and (e), respectively: 
A(3) a
person commits an offense if he disposes of human excreta in a method not
approved by the health department; (4) a person commits an offense if he
disposes of effluent from a septic tank in a method that creates a public
health nuisance; and (5) a person commits an offense if he removes human
excreta from any place and handle[s] it in a manner that creates a public
nuisance.@





[5]
We note that Appellant=s
proposed jury charge altered the provision by rephrasing the admonishing
language of Awaste of
any kind may not be stored, deposited, or disposed@
to Aa person commits an offense if he
deposits or disposes of polluting material or waste.@  Section 341.091 of the Health and Safety Code
provides:

 

(a)        A person commits an offense if the person
violates this chapter or a rule adopted under this chapter.  An offense under this Section is a
misdemeanor punishable by a fine of not less than $10 or more than $200.  

 

                                                             .               .                .

 

(c)        Each day of a continuing violation is a
separate offense.  

 

Tex.Health & Safety Code Ann. ' 341.091(a), (c)(Vernon
2001).  In additional to the criminal
penalty provision, violations of chapter 341 may be subject to civil
enforcement proceedings and penalties under Section 341.092 of the Health and
Safety Code.  See Tex.Health & Safety Code Ann. ' 341.092.





[6]
Appellant does not dispute the fact that he discharged sewage onto the ground
on the three alleged occasions.